THOMAS W. C. COLT *vs.* THADDEUS CLAPP.
MARY B. ROOT, administratrix, *vs.* SAME.
ELIZABETH C. NELSON *vs.* SAME.

Berkshire.    Sept. 9. — Oct. 27, 1879.    COLT, J., did not sit.    ENDICOTT & LORD, JJ., absent.

If one of several heirs, who orally agrees with his co-heirs to purchase certain shares of stock in a corporation, for their joint benefit, he to take the con-veyance to himself, the other heirs to contribute their respective proportions of the purchase money, and the matter to·be afterwards adjusted between them, refuses, on his acquiring the title to the shares, to make any adjustment, and informs the others that he has concluded to keep the stock himself, and subse-quently receives dividends on the stock, he is accountable to the other heirs severally for their respective shares of the dividends in actions for money ha1 and received; and the provisions of the Gen. Sts. c. 105, §§ 5, 6, do not apply to the case.

THREE ACTIONS OF CONTRACT for money had and received. Writs dated September 25, 1877.    The cases were tried together in the Superior Court, without a jury, before *Gardner*, J., who allowed a bill of exceptions in substance as follows:

Thaddeus Clapp, by his will, gave to his wife the use and in-come of nineteen shares of stock in Pontoosuc Manufacturing Company, for her life, and directed that the stock should stand in the name of his executor, in trust.    The residue of his estate he gave to his four children, who are the defendant, the plain-

tiffs in the first and third cases, and the intestate of the plaintiff in the second case.

Alexander Nelson, the husband of the plaintiff in the third case, testified for the plaintiffs, that about February 20, 1876, the defendant came to him, and asked him to buy of Mrs. Clapp her life interest in the nineteen shares of stock, for the defendant; that the witness refused, but said he would buy them for the four heirs; that the defendant said he was perfectly willing, as he had no interest beyond that of the heirs; that the defendant said, if the witness would buy them, he would take them for the heirs, and asked the witness to see the heirs; that the witness saw his wife and the plaintiff in the second case, and they authorized him to act for them; that he also saw the plaintiff in the first case, who said the arrangement was satisfactory to him, and that each one who would take and pay for his shares should have them transferred; that he then saw George W. Campbell, the brother of Mrs. Clapp, who acted as her agent, and he agreed to sell the shares for $5000; and the witness so informed the defendant; that he began negotiations on February 20; and on March 1, the defendant left for California; that the witness had arranged to pay the money the day before the defendant left, and on the Saturday before he left, the defendant was at the witness's house when the plaintiff in the third case said to him, "I am glad the shares have been bought to be distributed among the heirs; it will save trouble; my husband will pay for mine;" that the defendant said, "How about Thomas? I am afraid he is not able to pay for his;" and the witness said, "If Thomas does not take them, you may keep them according to the agreement;" that in August he saw the defendant at his own house, and said to him that he came to make a final settlement about those shares; that the defendant said, "Thomas has refused to take his shares;" and the witness answered, "What has that to do with me?" and the defendant said, "Since Thomas has refused, I have concluded to keep the shares myself."

The plaintiffs contended, upon the evidence, that Nelson declined to negotiate the purchase, except upon the condition, that the defendant would purchase the shares on account of and for the benefit of all the heirs, or such of them as would repay him their respective shares of the purchase money; that the defendant

assented to this condition, and that upon this condition Nelson negotiated with Campbell a sale of his sister's interest in the nineteen shares to the defendant for $5000, and notified the defendant that the sale had been agreed upon. There was evidence tending to show that thereupon the defendant paid the $5000 to the widow, (the defendant testifying that he paid it out of his own money, which he had previously borrowed for that purpose of parties in the city of New York,) and, through Campbell's agency, the widow transferred her interest to the defendant, by two instruments in writing, dated March 1, 1876, but of which neither Nelson nor the plaintiffs had any knowledge. Neither Nelson nor the defendant disclosed to Campbell that his sister's interest was being purchased on account of all the heirs.

The plaintiffs also introduced evidence tending to show that Nelson, acting for the plaintiffs, sought for the defendant on the afternoon of March 1, prepared to pay him their share of the purchase money, and finish up the transaction, but was unable to find him, and contended, upon the evidence, that the defendant avoided him. But this was denied by the defendant. The defendant left for California the next day on business, and did not return till about June 16. Nelson, immediately on his return from the sea-shore, where he had been for several weeks, in the August following, called upon the defendant at his house, and had the conversation above testified to. There was evidence tending to show that, on several subsequent occasions, the plaintiffs had requested the defendant to fulfil the agreement, as they claimed it to be; but the defendant declined so to do.

The defendant contended, and introduced evidence to show, that he made the purchase solely on his own account, and not on account of all the heirs or for their benefit.

On August 8, 1876, the Pontoosuc Woollen Manufacturing Co., of which the defendant had been the general business agent for the last twelve years, declared a dividend of $300 a share, and, on September 12 following, another dividend of $400 a share; and the defendant received the dividends on the nineteen shares to the amount of $13,300.

The plaintiffs, on July 11, 1877, each made formal tender to defendant of $1368.13, as their respective parts of the $5000, and demanded each one fourth part of said $13,300.

The defendant contended, as matter of law, and requested the Court to rule, as follows: "1. That, assuming the agreement to be as claimed by the plaintiffs, the entire consideration having been paid by the defendant, and the legal title to the widow's life interest in the shares being in the defendant, there was no resulting trust created in favor of the plaintiffs. 2. That such agreement, if proved, was void under Gen. Sts. *c.* 105, § 6."

The judge refused to rule as above requested; found in favor of each of the plaintiffs; and the defendant alleged exceptions.

*M. Wilcox & J. M. Barker*, for the defendant.

*H. L. Dawes*, for the plaintiffs.

AMES, J. It appears from the bill of exceptions, and from the finding of the judge, that the defendant was employed to make the purchase in question on behalf, and for the joint benefit, of the four heirs of the deceased, he being one of the four; and that he accepted this agency. The understanding was that the other heirs were to contribute their respective proportions, and the matter was afterwards to be adjusted between the parties. The defendant then received the conveyance, and immediately after found it necessary to go to California, where he had business. Upon his return, after an absence of three and a half months, he notified his co-heirs, on being called upon to make the final adjustment, that on the whole he had concluded to keep the property himself. It hardly need be said, that in this proceeding he acted under a decided misapprehension of his rights and duties under the law of agency. Story on Agency, § 212, and cases cited. It appears also that he has received in dividends upon the stock in question an amount, in less than two years, of considerably more than double the price which he advanced in making the purchase.

The only question in the case, therefore, is whether the remedy for this breach of faith can properly be sought in an action for money had and received. What he undertook to purchase, on the joint account of the heirs, from the widow of the testator, and what she in fact conveyed to him, was her right from time to time, so long as she should live, to receive any and all dividends which during that time should accrue or be declared upon the nineteen shares which the will of the testator had directed to be held in trust for her for that purpose.

Under that conveyance, he has collected, in two of those dividends, a large sum of money, which he has undertaken to appropriate to his own exclusive use. But this, as we have seen, he cannot lawfully do; and having as an agent for others been employed to make the purchase, he, by undertaking to purchase for himself, must be considered as a trustee for his principals severally. It is contended by the plaintiffs, and appears to be conceded by the defendant, that the case is not one of a resulting trust in its technical sense, nor is it one of that class of trusts which can only be enforced by proceeding in equity. It was an express agreement, upon good consideration and lawful in itself, that he would purchase the widow's interest in these expected dividends, for and on account of the plaintiffs and himself, each to have one fourth of whatever should thereby be realized. Of the money which has thus come to his hands, one fourth part is properly his own, and he is accountable for the remainder to the three plaintiffs each in a like proportion. Each of these plaintiffs has a right to say that the defendant has money in his hands for which *ex æquo et bono* he can be charged in these actions. It is difficult to see any legal or equitable ground that he can have for retaining it. In this case there was an express agreement, and the objection of want of privity is without foundation. *Brigham* v. *Eveleth*, 9 Mass. 538. *Stiles* v. *Campbell*, 11 Mass. 321. *Hall* v. *Marston*, 17 Mass. 575. *Brinley* v. *Kupfer*, 6 Pick. 179. *Fanning* v. *Chadwick*, 3 Pick. 420. *Hills* v. *Bearse*, 9 Allen, 403.

As to the objection founded upon the statute of frauds, Gen. Sts. *c.* 105, § 5, that section is applicable only to the contract between seller and buyer, and not to the case of the liability of an agent, for making a purchase, to his principal and employer. Section 6 of the same statute was intended to prevent that form of stock-jobbing, in which a person owning no shares and having no authority from any one undertakes to sell as if he were an owner. This is an entirely different case, and one to which that statute has no application.                    *Exceptions overruled.*